UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Court File No. 21-cr-38 (ECT/LIB) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| John Thomas Paciorek, | |
| Defendant. | |

This matter comes before the undersigned United States Magistrate Judge upon Defendant John Thomas Paciorek's ("Defendant") Motion to Suppress any Evidence Obtained as a Result of any Illegal Searches or Seizures, [Docket No. 25], and his Motion to Suppress any Evidence Obtained as a Result of any Illegal Interrogations, [Docket No. 26]. This case has been referred to the undersigned Magistrate Judge for a report and recommendation, in accordance with 28 U.S.C. § 636(b)(1) and Local Rule 72.1. The Court held a motions hearing on April 16, 2021, regarding the parties' pretrial motions at which the parties requested the opportunity to submit supplemental briefing on the present motions. The supplemental briefing was completed on May 19, 2021, and this Court took Defendant's Motion to Suppress any Evidence Obtained as a Result of any Illegal Searches or Seizures, [Docket No. 25], and his Motion to Suppress any Evidence Obtained as a Result of any Illegal Interrogations, [Docket No. 26], under advisement on May 19, 2021.[1]

For reasons discussed herein, the Court recommends that Defendant's Motion to Suppress any Evidence Obtained as a Result of any Illegal Searches or Seizures, [Docket No. 25], be **DENIED**, and his Motion to Suppress any Evidence Obtained as a Result of any Illegal Interrogations, [Docket No. 26], be **DENIED**.

---

[1]The Court addressed the parties' pretrial discovery motions by separate order. [Docket No. 39].

## I.    BACKGROUND AND STATEMENT OF FACTS

### A.  Background

Defendant is charged with one count of armed bank robbery, in violation of 18 U.S.C. §§ 2, 2113(a), and 2113(d). (Indictment [Docket No. 1]).

### B.  Facts

The record presently before the Court indicates that at approximately 7:40 a.m. on July 24, 2020, the Garrison, Minnesota branch of Deerwood Bank was robbed. (Tr. [Docket No. 38], at 15). Subsequently, the Crow Wing County Sherriff's Office and the Federal Bureau of investigation began investigating the robbery. (Tr. [Docket No. 38], at 15–17). As relevant to the present Motions, law enforcement filed several applications for search warrants and interviewed Defendant as part of that investigation.

On July 25, 2020, Investigator Derek LaVoy with the Crow Wing County Sherriff's Office filed a state court application for a search warrant to authorize the search of records related to a certain Verizon mobile telephone number (the "Verizon Number"). (Gov't's Ex. 4).[2]

In the affidavit filed in support of the July 25, 2020, Verizon Number Search Warrant, Investigator LaVoy stated that "[o]n July 24, 2020, at 0744 a.m., the Crow Wing County Sherriff's Office responded to a robbery at Deerwood Bank." (Gov't's Ex. 4 at 5). An employee of the bank stated that a male emerged from the bushes near the bank entrance holding a handgun, demanded the employee open the door and disarm the security system, and threatened to shoot the employee if he did not comply. (Id. at 6). The employee and suspect then entered the bank, the employee gave the suspect cash from the teller drawer, and the suspect demanded the employee open the

---

[2] Government's Exhibit 4 is the warrant application, supporting affidavit, and warrant to obtain and search records related to the Verizon Number. At the Motions Hearing, the Government, without objection, offered the warrant application, supporting affidavit, and warrant into evidence as Government's Exhibit 4. (Tr. [Docket No. 38], at 31–32).

bank vault, but the employee was unable to do so. (Id.). When the suspect went into the bank manager's office, the employee fled the building and contacted law enforcement. (Id.).

Investigator LaVoy also stated that Bank security surveillance footage shows that the suspect appeared to be approximately 5'11" or 6" tall, medium build, and was wearing sunglasses and a baseball cap. (Id.). The suspect had a goatee that was gray and white in color. (Id.). An object was visible in the suspect's pants pocket that was consistent in dimension with a cellular telephone. (Id.). Minnesota driver and vehicle services ("DVS") records list James Ardito's ("Ardito") height as 6" and weight as 230 pounds, and a DVS photograph dated June 8, 2018, shows Ardito with a gray and white goatee. (Id.). Surveillance footage from an onsite ATM "shows a white sedan, resembling a Cadillac, travelling south on US highway 169 adjacent to the bank" and stopping on the highway south of the bank. (Id.). The robbery suspect can be "observed walking at a fast pace across the parking lot and into the vehicle," and the vehicle "then proceeds south on US Highway 169." (Id.).

After the images were posted online, a U.S. Federal Probation Officer contacted the Crow Wing County Sherriff's Office and stated that the images of the bank robbery suspect "bear a strong resemblance to James Richard Ardito," who had recently absconded from federal supervision. (Id.). An associate of Ardito contacted law enforcement and stated that he believed the bank robbery suspect was Ardito, and that Ardito had called the associate by phone on July 17 or 18 from the Verizon Number. (Id. at 6–7). The associate also stated that Ardito had provided the associate with the Verizon Number to contact Ardito, and the associate did call the Verizon Number at a later time and it was answered by Ardito. (Id. at 7).

3

Lastly, Investigator LaVoy stated that in 2007, Ardito was convicted and sentenced to federal prison for robbing the same branch of Deerwood Bank. (Id.). In that prior robbery, Ardito had used a handgun, and he had worn a baseball cap and sunglasses. (Id.).

The Honorable Chuck Halverson, District Court Judge for the State of Minnesota, Ninth Judicial District, County of Crow Wing, determined that probable cause existed to support the issuance of the July 25, 2020, Verizon Number Search Warrant. (Id. at 13–14). The July 25, 2020, Verizon Number Search Warrant authorized the search of records related to the Verizon Number. (Id. at 9–14). Thereafter, Investigator LaVoy executed the July 25, 2020, Verizon Number Search Warrant. (Id. at 15).

On July 26, 2020, Investigator Justin Athman with the Crow Wing County Sherriff's Office filed a state court application for a search warrant to authorize the search of a residence located in Andover, Minnesota (the "Residence"), "[a] white Cadillac motor vehicle, unknown license plate," and Ardito himself. (Gov't's Ex. 7).[3]

In the affidavit filed in support of the July 26, 2020, Search Warrant, Investigator Athman provided essentially the same information as was provided in reference to the Verizon Number. (Gov't's Ex. 7). However, Investigator Athman also provided additional information.

Investigator Athman indicated that he spoke with Ms. Larson on July 25, 2020, who stated that Defendant used to live at her residence, and that Defendant owns a Cadillac but had not yet registered it under his own name. (Id.). Ms. Larson further indicated that Defendant was "best buds" with "Jim," that she did not know Jim's last name, but "he was the one who had 'robbed' the bank," that she knew Jim had robbed the bank because she had seen his picture and recognized

---

[3] Government's Exhibit 7 is the warrant application, supporting affidavit, and warrant to search a certain residence, a white Cadillac, and Ardito. At the Motions Hearing, the Government, without objection, offered the warrant application, supporting affidavit, and warrant into evidence as Government's Exhibit 7. (Tr. [Docket No. 38], at 31–32).

him, and "that there could be a female with him named Melissa, who was [Defendant's] girlfriend." (Id.). Ms. Larson also indicated that her landlord/roommate Mr. Alle had told her that he received a text from Defendant indicating that "Melissa and Jim took his car and did some crazy shit to it," that Alle had advised Defendant that he knew they robbed the bank and everyone was looking for them, that the gun Jim had was a 9mm which belonged to Defendant, that Defendant had gotten the gun at a gun show in Mankato for $600, and that Defendant "wanted Alle to register [the gun] under Alle's name, but Alle wouldn't." (Id.).

In addition, Ms. Larson indicated that she had seen Jim on Wednesday night, and he was wearing a navy-blue sweatshirt, baseball cap, and blue jeans. (Id.). She indicated that she had last seen Defendant on Tuesday night, he had driven a Cadillac that was "pearl white and square in the back," the Cadillac driven by Defendant "was the same kind of car as the one in the picture from the bank robbery," and Defendant informed her that he and Jim "were going to go up north." (Id. at 4–5).

Investigator Athman indicated that he subsequently learned that Alle had been contacted by law enforcement and had "identified Jimmy as the guy with the gun in the robbery and he was 100% sure it was Jimmy." (Id. at 5). Alle had also stated he "used to live 3 doors down from Jimmy," Defendant "was Alle's roommate up until two months ago because Alle and Larson didn't like [Defendant's] girlfriend Melissa," Defendant bought a Cadillac about a month prior and showed Alle the car when he bought it, Defendant and Jimmy had bought a 9mm handgun from a Mankato gun show previously, Jimmy came over on Wednesday and stated he was going up north, and that he had texted Defendant about the robbery and Defendant "said Jimmy and Melissa took his car and then didn't answer." (Id.).

Investigator Athman followed up with Alle and Larson, and he confirmed that Alle had received a message via Facebook that indicated, "Jimmy and Melissa went abd [sic] did some shit in my car now I dont [sic] know where they are," from Facebook account "John Paciorek." (Id.). Investigator Athman "put a preservation request into Facebook for said account." (Id.).

Investigator Athman also indicated that he spoke with Mr. Sutliff on January 26, 2020. (Id.). Mr. Sutliff identified the bank robbery suspect as "James." (Id.). Investigator Athman also spoke with Mr. Deopke on July 26, 2020, and she "indicated that she was 100% confident that it was Ardito" who was the bank robbery suspect. (Id. at 6).

Investigator Athman further indicated that Law enforcement identified Defendant's girlfriend Melissa as Melissa Brooks. (Id. at 5). A traffic stop was conducted on Ms. Brooks, and she agreed to speak with law enforcement via telephone. (Id. at 6). Ms. Brooks indicated that Ardito was at the Residence, she believed he was alone, she had been at a hotel in Elk River (the "Hotel") with Defendant on July 23, 2020, they had driven to the Hotel together in a white Grand Am vehicle, they checked out around 10:00 or 10:30 a.m. on July 24, 2020, and they left the Hotel together in the white Grand Am. (Id.). However, Ms. Brooks stated that "it was possible [Defendant] could have left the room while she was sleeping as he was awake when she awoke." (Id.). Ms. Brooks also stated that she had never seen Defendant drive or have in his possession a white Cadillac. (Id.).

Investigator Athman stated that he had contacted the Hotel, and he was informed by the front desk manager that Defendant had checked in to the Hotel at 00:05 a.m. and checked out at 9:50 a.m. on July 24, 2020. (Id. at 6–7). However, the front desk manager was not working when Defendant checked in. (Id. at 7). The front desk manager stated that she remembered them because two middle aged gentlemen had walked in the front door and asked to use the pool around 8:30 or

9:00 a.m. on July 24, 2020, she stated they had to be registered guests, and they replied that they were in room 106 and then went to their room. (Id.). She stated that the men were carrying clothes. (Id.). "[A] Cadillac and a Grand Prix were associated with the registration," and "they wrote down that both colors were white" but did not provide license plate numbers. (Id.). Two men, a woman, and a child checked out, and the two men left in the white Cadillac while the woman and child left in the Grand Prix. (Id.). The front desk manager arrived at work at 7:00 a.m. and did not recall any activity from room 106 until the two men walked in the front door and asked about the pool. (Id.).

Investigator Athman indicated that he was informed the Residence had been associated with narcotics and other criminal activity for several years. (Id. at 7–8). And Investigator Athman provided a description of the Residence. (Id. at 8). Investigator Athman also provided Ardito's criminal history. (Id.).

The Honorable Bethany Fountain Lindberg, District Court Judge for the State of Minnesota, Tenth Judicial District, County of Anoka, determined that probable cause existed to support the issuance of the July 26, 2020, Search Warrant. (Id. at 12–13). The July 26, 2020, Search Warrant authorized law enforcement to search the Residence, the white Cadillac with an unknown license plate, and Ardito himself. (Id. at 11–13). Thereafter, the July 26, 2020, Search Warrant was executed. (Id. at 14).

On July 29, 2020, Investigator LaVoy filed a state Court application for a search warrant to authorize the search and seizure of records related to a certain Sprint Corporation mobile telephone number (the "Sprint Number"). (Gov't's Ex. 2).[4]

---

[4] Government's Exhibit 2 is the warrant application, supporting affidavit, and warrant to obtain and search records related to the Sprint Number. At the Motions Hearing, the Government, without objection, offered the warrant application, supporting affidavit, and warrant into evidence as Government's Exhibit 2. (Tr. [Docket No. 38], at 31–32).

In the affidavit filed in support of the July 29, 2020, Sprint Number Search Warrant, Investigator LaVoy provided essentially the same information as was provided in reference to the Verizon Number. (See, Gov't Ex. 2). However, Investigator LaVoy also provided additional information.

Investigator LaVoy indicated that he had obtained and executed a search warrant for the Verizon Number which belonged to Ardito, and he learned that the Verizon Number was in the vicinity of the Residence on July 25, 2020. (Id. at 7). On July 27, 2020, a search warrant was executed on the Residence, and Ardito was arrested on site. (Id.). Ardito identified the Verizon Number as his own. (Id.). In addition, Investigator LaVoy indicated that the Crow Wing Sherriff's Office had received several reports about the white Cadillac involved in the robbery of Deerwood Bank. (Id.). One such reporting party who was an associate of Defendant recognized the Cadillac as being owned by Defendant. (Id.). That associate further stated that Defendant had recently purchased the Cadillac "and more than likely ha[d] not yet transferred ownership into his name." (Id. at 7–8).

Investigator LaVoy also indicated that Law enforcement had received information that Defendant has a friend named "James" who had previously served time for a bank robbery, and that Defendant, James, Ms. Brooks, and Ms. Brook's young child had recently stayed at the Hotel. (Id. at 8). Investigator LaVoy stated that images from the Hotel surveillance footage "depict a male subject bearing a strong resemblance to James Ardito, who is wearing a baseball cap and sunglasses that are similar to those worn by the male suspect in the Deerwood Bank video surveillance footage." (Id.).

Investigator LaVoy further indicated that another associate of Defendant had contacted law enforcement and stated that Defendant had arrived at the associate's house driving a cream-colored

8

Cadillac on the morning of the robbery, that "Jim" had been with Defendant, and that Defendant and Jim left in the Cadillac. (Id.). The associate also reported having received a video sent from Defendant at the Sprint Number depicting an individual being beaten, and the associate "interpreted the video to be a threatening message from [Defendant], dissuading them from speaking to law enforcement." (Id.).

Finally, Investigator LaVoy indicated that in the phone associated with the Verizon Number belonging to Ardito there was a contact for the Sprint Number listed as "John." (Id. at 8–9). Phone records obtained pursuant to the Verizon Number Search Warrant indicate that there were communications between the Verizon Number, associated with Ardito, and the Sprint Number, associated with Defendant, in excess of 100 times. (Id. at 9). "Communications between these numbers occurred on the date of the robbery, July 24, 2020, during the time before and immediately following the bank robbery." (Id.).

The Honorable Judge Halverson determined that probable cause existed to support the issuance of the July 29, 2020, Sprint Number Search Warrant. (Id. at 15–16). The July 29, 2020, Sprint Number Search Warrant authorized the search of records related to the Sprint Number. (Id. at 11–16). Thereafter, Investigator LaVoy executed the July 29, 2020, Sprint Number Search Warrant. (Id. at 14).

On August 18, 2020, at approximately 1:00 p.m., Defendant was Interviewed at the Crow Wing County Jail by Special Agent Daniel Eckardt ("SA Eckardt") and Sergeant DJ Downie (together, the "Interviewers"). (Gov't Ex. 1 at 0:00–0:35). The entire Interview was recorded. (See, Gov't Ex. 1; Tr. [Docket No. 38], at 18–19).[5]

---

[5] At the Motions Hearing, the Government, without objection, offered the recording of the August 18, 2020, interview into evidence as Government's Exhibit 1. (Tr. [Docket No. 38], at 19).

On August 26, 2020, Investigator LaVoy filed a state Court application for a search warrant to authorize the search of a black Motorola cellular telephone that had been taken from Defendant's person. (the "Motorola Phone"). (Gov't's Ex. 3).[6]

In the affidavit filed in support of the August 26, 2020, Motorola Phone Search Warrant, Investigator LaVoy provided essentially the same information as was provided in reference to the Sprint Number. (See, Gov't's Ex. 3). However, Investigator LaVoy also provided additional information.

Investigator LaVoy indicated that an arrest warrant was issued for Defendant, and he was arrested on August 15, 2020. (Id. at 5). The Motorola Phone was taken from Defendant's person upon his arrest, and it was subsequently sent to Investigator LaVoy. (Id.).

The Honorable Judge Halverson determined that probable cause existed to support the issuance of the August 26, 2020, Motorola Phone Search Warrant. (Id. at 7–9). The August 26, 2020, Motorola Phone Search Warrant authorized the search of the Motorola Phone. (Id.). Thereafter, Investigator LaVoy executed the August 26, 2020, Motorola Phone Search Warrant. (Id. at 10).

## II.    DEFENDANT'S MOTION TO SUPPRESS ANY EVIDENCE OBTAINED AS A RESULT OF ANY ILLEGAL SEARCHES OR SEIZURES [Docket No. 25]

Defendant moves the Court for an Order suppressing physical evidence obtained from the execution of: the July 25, 2020, Verizon Number Search Warrant; the July 26, 2020, Search Warrant; the July 29, 2020, Sprint Number Search Warrant; and the August 26, 2020, Motorola

---

[6] Government's Exhibit 3 is the warrant application, supporting affidavit, and warrant to search the Motorola Phone. At the Motions Hearing, the Government, without objection, offered the warrant application, supporting affidavit, and warrant into evidence as Government's Exhibit 3. (Tr. [Docket No. 38], at 31–32).

Phone Search Warrant. (Def.'s Mot. to Suppress any Evid. Obtained as a Result of any Illegal Searches or Seizures [Docket No. 25]).[7]

## A.  Standard of Review

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. Amend. IV. The Eighth Circuit has held that "[a]n affidavit establishes probable cause for a warrant if it sets forth sufficient facts to establish that there is a fair probability that contraband or evidence of criminal activity will be found in the particular place to be searched." United States v. Mutschelknaus, 592 F.3d 826, 828 (8th Cir. 2010) (internal quotation marks and citation omitted). "Probable cause is a fluid concept that focuses on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" United States v. Colbert, 605 F.3d 573, 576 (8th Cir. 2010) (quoting Illinois v. Gates, 462 U.S. 213, 231 (1983)). Courts use a "totality of the circumstances test . . . to determine whether probable cause exists." United States v. Hager, 710 F.3d 830, 836 (8th Cir. 2013) (citation omitted).

The sufficiency of a search warrant affidavit is examined using "common sense and not a hypertechnical approach." United States v. Grant, 490 F.3d 627, 632 (8th Cir. 2007) (citation and internal quotations omitted). "In ruling on a motion to suppress, probable cause is determined based on 'the information before the issuing judicial officer.'" United States v. Smith, 581 F.3d 692, 694 (8th Cir. 2009) (quoting United States v. Reivich, 793 F.2d 957, 959 (8th Cir. 1986)). "Therefore, '[w]hen the [issuing judge] relied solely upon the supporting affidavit to issue the

---

[7] The Court also admitted and retained Government's Exhibit 5, which is the August 5, 2020, search warrant for a telephone number ending 3894. (Gov't's Ex. 5). However, at the Motions Hearing, the Government stated that Exhibit 5 is missing an application, and the Government stipulated that it would not use the evidence, if any, obtained as a result of that search warrant for any purpose. (Tr. [Docket No. 38], at 34–37).

warrant, only that information which is found in the four corners of the affidavit may be considered in determining the existence of probable cause.'" <u>United States v. Wiley</u>, No. 9–cr–239 (JRT/FLN), 2009 WL 5033956, at *2 (D. Minn. Dec. 15, 2009) (quoting <u>United States v. Solomon</u>, 432 F.3d 824, 827 (8th Cir. 2005)) (alterations in original). In addition, the issuing court's "determination of probable cause should be paid great deference by reviewing courts." <u>Gates</u>, 462 U.S. at 236 (quoting <u>Spinelli v. United States</u>, 393 U.S. 410, 419 (1969)). "[T]he duty of a reviewing court is simply to ensure that the [issuing court] had a 'substantial basis for . . . conclud[ing]' that probable cause existed." <u>Id.</u> at 238–39 (quoting <u>Jones v. United States</u>, 362 U.S. 257, 271 (1960)).

### B.  Analysis

#### i.  The July 25, 2020, Verizon Number Search Warrant

Defendant seeks an Order of this Court suppressing all evidence flowing from the July 25, 2020, Verizon Number Search Warrant. (Def.'s Mem. [Docket No. 41], at 3).

The Government argues that Defendant "lacks the requisite standing to challenge evidence obtained from a search and seizure of data and information tied to" the Verizon Number. (Gov't's Mem. [Docket No. 42], at 10–12). Specifically, the Government contends that a four-corners review of Government Exhibit 4 indicates that the Verizon Number belonged to Ardito, and Defendant "cannot be said to have a legitimate expectation of privacy in items that do not belong to him." (<u>Id.</u> at 11–12).

The Court must first address this threshold, and potentially dispositive, issue of standing. Defendant may <u>only</u> challenge a search warrant for which he has standing to challenge.

As noted above, the Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and that

"no warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. Amend. IV. However, Fourth Amendment rights are personal, and therefore, they may not be asserted vicariously. United States v. Barragan, 379 F.3d 524, 529 (8th Cir. 2004) (citing Rakas v. Illinois, 439 U.S. 128, 133–34 (1978)).

"An individual asserting Fourth Amendment rights 'must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable.'" Barragan, 379 F.3d at 529 (citing Minnesota v. Carter, 525 U.S. 83, 88 (1998)); Rakas, 439 U.S. at 133–34. The defendant bears the burden of proving a reasonable expectation of privacy in the area searched. Rakas, 439 U.S. at 130–31.

To establish a legitimate expectation of privacy, a defendant must show a subjective expectation of privacy and that his expectation of privacy is one that society is prepared to recognize as objectively reasonable. "If a defendant fails to prove a sufficiently close connection to the relevant places or objects searched, he has no standing to claim that they were searched or seized illegally." Barragan, 379 F.3d at 529–30 (citing United States v. Gomez, 16 F.3d 254, 256 (8th Cir. 1994)). Ultimately, "[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." Rakas, 439 U.S. at 134.

The Eighth Circuit has enumerated factors for courts to consider in deciding whether a defendant had an expectation of privacy triggering standing to challenge the constitutionality of a search including:

> [O]wnership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case.

Gomez, 16 F.3d at 256 (citing States v. Sanchez, 943 F.2d 110, 113 (1st Cir. 1991)).

The affidavit submitted in support of the July 25, 2020, Verizon Number Search Warrant does not offer any indication that Defendant has any privacy interest in the Verizon Number. (See, Gov't Ex. 4). Rather, the affidavit indicates that the Verizon Number belonged to Ardito. (See, Id.). For example, the affidavit indicates that an associate of Ardito's had contacted law enforcement and stated that Ardito had called the associate from the Verizon Number, that Ardito had provided the associate with the Verizon Number to contact Ardito, and that the associate had called the Verizon Number and it was answered by Ardito. (Id. at 6–7).

Further and most importantly, Defendant fails to make any attempt before this Court to establish that he has standing to challenge the July 24, 2020, Verizon Number Search Warrant. (See, Def.'s Mem. [Docket No. 41]). Defendant fails to offer any factual basis upon which the Court could reasonably conclude that he had a personal privacy interest in the Verizon Number. (See, Id.).

On the record now before the Court, each of the delineated factors weighs in favor of finding that Defendant lacks standing to assert any challenge to evidence flowing from the Verizon Number as a result of the execution of the July 25, 2020, Verizon Number Search Warrant. Defendant fails to even allege that he has an ownership interest or control over the Verizon Number; fails to even allege that he ever used the Verizon Number or had any ability to regulate use of the Verizon Number; and fails to even allege that he had a subjective expectation of privacy in the Verizon Number.

It is Defendant who bears the burden of proving a reasonable expectation of privacy in the area searched. Rakas, 439 U.S. at 130–31. Regarding the Verizon Number, which was authorized

to be searched by the July 25, 2020, Verizon Number Search Warrant, Defendant has wholly failed to meet his burden.

On that basis, the Court concludes that Defendant lacks standing to challenge the search of the Verizon Number, and therefore, Defendant lacks standing to seek the suppression of any evidence flowing from the execution of the July 25, 2020, Verizon Number Search Warrant.

Therefore, to the extent it seeks an Order of this Court suppressing all evidence flowing from the execution of the July 25, 2020, Verizon Number Search Warrant, the undersigned recommends that Defendant's Motion to Suppress any Evidence Obtained as a Result of any Illegal Searches or Seizures, [Docket No. 25], be **DENIED**.

### ii.    The July 26, 2020, Search Warrant

Defendant seeks an Order of this Court suppressing evidence flowing from the July 26, 2020, Search Warrant, which authorized law enforcement to search the Residence, the white Cadillac with an unknown license plate, and Ardito himself. (Def.'s Mem. [Docket No. 41], at 3). Defendant does not challenge the search of the Residence or Ardito. (Id.). However, Defendant does challenge any search of the Cadillac. (Id.). Defendant argues that because the July 26, 2020, Search Warrant described the vehicle "only as 'a white Cadillac motor vehicle, unknown license plate,' it fail[ed] the particularity requirement of the Fourth Amendment and the car and any evidence seized from it must be suppressed." (Id.).

As observed above, the Fourth Amendment states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and <u>particularly describing the place to be searched</u>, and the persons or things to be seized." U.S. Const. amend. IV (emphasis added). To satisfy the particularity requirement, the place to be search must be "described with sufficient particularity as to enable the executing officer to locate and identify the premises with reasonable

effort" and to avoid mistakenly searching the wrong premises or seizing the wrong items. United States v. Gitcho, 601 F.2d 369, 371 (8th Cir. 1979); United States v. Thomas, 263 F.3d 805, 808 (8th Cir. 2001); United States v. Gleich, 397 F.3d 608, 611 (8th Cir. 2005). "[T]he warrant must be sufficiently definite to enable the searching officers to identify the property authorized to be seized." United States v. Sigillito, 759 F.3d 913, 923 (8th Cir. 2014) "[T]he degree of specificity required will depend on the circumstances of the case and on the type of items involved. This particularity standard is one of 'practical accuracy rather than' of hypertechnicality." Sigillito, 759 F.3d at 923; see also, Groh v. Ramirez, 540 U.S. 551, 557 (2004); United States v. Fitzgerald, 724 F.2d 633, 637 (8th Cir.1983).

"Typically, a warrant that is not particular enough cannot be cured by the specificity of the affidavit supporting it" because "[s]pecificity is required in the warrant itself in order to limit the discretion of the executing officers as well as to give notice to the party searched." Thomas, 263 F.3d at 808 (citing United States v. Johnson, 541 F.2d 1311, 1315 (8th Cir. 1976)). "However, if the affidavit is incorporated into the warrant, it may cure the particularity defect of the warrant if the affidavit accompanies the warrant and the warrant uses suitable words of reference to incorporate the affidavit." Thomas, 263 F.3d at 808.

Here, the warrant application, supporting affidavit, and warrant have been presented as a whole and admitted into evidence without objection as Government's Exhibit 7. (Tr. [Docket No. 38], at 31–32). Therefore, the record presently before this Court indicates that the warrant, application, and affidavit were executed as a whole, and Defendant has not raised any argument to the contrary. Moreover, in addition to incorporating the affidavit by virtue of its attachment, Judge Lindberg also incorporated the affidavit by reference. (Gov't Ex. 7 at 12).

Judge Lindberg clearly indicated that her finding of probable cause was premised on her reading of the application, which included the supporting affidavit. (See, Id.). The affidavit indicates that Defendant's white Cadillac was the vehicle to be searched pursuant to the July 26, 2020, Search Warrant, as well as, that there was a fair probability that evidence of the robbery would be found in said white Cadillac because: the bank robbery suspect, who was thought to be Ardito, was seen on surveillance footage getting into a white sedan that resembled a Cadillac; Defendant was identified as owning and driving a white Cadillac that was not registered under his own name and resembled the vehicle in the surveillance footage; Defendant was identified as associating with Ardito around the time of the robbery; Defendant was identified as having previously purchased a handgun which may have been used in the robbery; a room at the Hotel was registered to Defendant on July 24, 2020, and a white Cadillac was associated with the registration; and Defendant and a another man were seen entering the Hotel on the morning of July 24, 2020, and subsequently leaving in a white Cadillac. (Id. at 3–7). Those facts indicate that there is a fair probability that evidence of the bank robbery will be found in Defendant's white Cadillac, as well as, that Defendant's white Cadillac, license unknown, is the vehicle to be searched.

The affidavit further indicates that Ardito was at the Residence on July 25 and 26, 2020. (Id. at 6). Thus, there was a fair probability that Ardito would be at the Residence when the July 26, 2020, Search Warrant was executed. As such, there was a fair probability that Defendant too would be at the Residence due to his connection to Ardito and possible involvement in the bank robbery. And because Defendant owned the white Cadillac that was also connected with Ardito and possibly the robbery, there was a fair probability that any white Cadillac found at the Residence would indeed be Defendant's Cadillac.

In sum, the July 26, 2020, Search Warrant and attached application/affidavit plainly indicated that the white Cadillac to be searched belonged to Defendant, thereby enabling the executing officer to locate and identify the white Cadillac and to avoid mistakenly searching the wrong vehicle. Furthermore, it was not practical or even possible for Investigator Athman to provide additional details, such as the white Cadillac's license plate or VIN, because Defendant had not yet registered the Cadillac in his own name. Accordingly, under the totality of the circumstances, the Court finds that the July 26, 2020, Search Warrant was not overbroad, and it did not lack in particularity.

Moreover, even if the Eighth Circuit's precedent did require more specific language to incorporate the affidavit or describe the white Cadillac to be searched, the present circumstances fall squarely into the good-faith exception.

"'A violation of the Fourth Amendment usually triggers exclusion of evidence obtained by way of the violation from a subsequent criminal prosecution.' 'Because exclusion is a prophylactic remedy, however, there are some instances where a Fourth Amendment violation does not trigger the exclusionary rule.'" United States v. Rodriguez, 834 F.3d 937, 941 (8th Cir. 2016). One such instance was recognized in United States v. Leon, 468 U.S. 897 (1984), and exists "'when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope,' even if the warrant is subsequently invalidated." See, Rodriguez, 834 F.3d at 941 (quoting Leon, 468 U.S. at 920).

However, the good-faith exception does not apply if:

(1) the affiant mislead the issuing judge with a knowing or reckless false statement; (2) the issuing judge wholly abandoned [his or] her judicial role; (3) the supporting affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or (4) the warrant was "so facially deficient" that the executing officer could not reasonably presume its validity.

18

United States v. Notman, 831 F.3d 1084, 1089 (8th Cir. 2016) (quoting Leon, 468 U.S. at 923) (emphasis added).

"In assessing whether the officer relied in good faith on . . . a warrant, [the Court] consider[s] the totality of the circumstances, including any information known to the officer but not included in the affidavit." United States v. Johnson, 848 F.3d 872, 879 (8th Cir. 2017) (quoting United States v. Grant, 490 F.3d 627, 632 (8th Cir. 2007)). The Court's "inquiry is confined to 'the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.'" United States v. Hopkins, 824 F.3d 726, 733 (8th Cir. 2016) (quoting Leon, 468 U.S. at 922 n.23).

The record currently before the Court shows that law enforcement's good-faith reliance on the warrant issued authorizing the search of the white Cadillac militates against suppressing any evidence obtained during the execution of the July 26, 2020, Search Warrant. As already noted, the facts provided by Investigator Athman in the affidavit attached to the July 26, 2020, Search Warrant clearly indicated that the particular white Cadillac to be searched belonged to Defendant. Accordingly, the law enforcement officers that executed the July 26, 2020, Search Warrant had reason to believe that the warrant was sufficiently particular in describing the vehicle to be searched. Defendant has not demonstrated or even argued otherwise.

Thus, the Court concludes that the officers involved relied in good faith on the July 26, 2020, Search Warrant.

Therefore, to the extent it seeks an Order of this Court suppressing evidence flowing from the execution of the July 26, 2020, Search Warrant, the undersigned recommends that Defendant's Motion to Suppress any Evidence Obtained as a Result of any Illegal Searches or Seizures, [Docket No. 25], be **DENIED**.

### iii. The July 29, 2020, Sprint Number Search Warrant

Defendant seeks an Order of this Court suppressing evidence flowing from the July 29, 2020, Sprint Number Search Warrant. (Def.'s Mem. [Docket No. 41], at 1–2). Defendant argues that "the sum of the total information of the affidavit does not demonstrate that Defendant's car was used in the robbery, that Defendant had anything to do with the robbery, that this telephone would have any information relating to it that would have any bearing whatever on the robbery, or who perpetrated it." (Id.). This Court disagrees.

"[A] magistrate reviewing a warrant application is charged with the duty of determining whether a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Alexander, 574 F.3d 484, 489 (8th Cir. 2009) (quoting United States v. Hart, 544 F.3d 911, 914 (8th Cir. 2008)). "[T]here must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue . . . ." United States v. Tellez, 217 F.3d 547, 550 (8th Cir. 2000) (citing United States v. Koelling, 992 F.2d 817, 823 (8th Cir. 1993)).

Considering the affidavit submitted in support of the July 29, 2020, Sprint Number Search Warrant which authorized law enforcement to the search and seize records related to the Sprint Number, Judge Halverson could reasonably have concluded that there was a fair probability that evidence of the alleged robbery of Deerwood Bank would be found in the records related to the Sprint Number.

Specifically, the Court notes that the affidavit clearly connects Ardito to the robbery. For example, the affidavit states that bank surveillance footage indicated that the robbery suspect was of similar height and weight as Ardito was listed in DVS records, and that both Ardito and the suspect had a gray and white goatee. (Gov't's Ex. 2 at 6). Furthermore, Ardito was reported by an

individual that saw him on the morning of the robbery as "wearing the same clothing" and "match[ing] the physical description" of the robbery suspect. (Id. at 8). In addition, a federal probation officer stated that Ardito bore "a strong resemblance" to the robbery suspect, and an associate of Ardito's stated that he believed the robbery suspect was Ardito. (Id. at 6). The affidavit also indicated that Ardito had been arrested in connection with the robbery. (Id. at 7). When taken together, this information clearly connects Ardito to the robbery as a suspect.

The affidavit also connects to the Sprint Number to Ardito, as well as, to the robbery. Upon his arrest, Ardito had provided the Verizon Number as his own. (Id. at 7). In the phone associated with the Verizon Number, the Sprint Number was saved to a contact listed as "John." (Id. at 8–9). More importantly, phone records obtained pursuant to a search of the Verizon Number indicate that communications occurred between the Verizon Number, belonging to Ardito, and the Sprint Number before and immediately following the robbery. (Id. at 9).

Moreover, the affidavit connects Defendant and his Cadillac with both Ardito and the robbery. For example, an associate of Defendant reported that they recognized the vehicle that the robbery suspect fled in as Defendant's Cadillac. (Id. at 7). That same associate stated that Defendant had a friend named "James" who had previously done time for robbery, as well as, that Defendant stayed with James recently in a hotel. (Id. at 8). Investigator LaVoy indicated that the surveillance footage from the Hotel where Defendant stayed at the time of the robbery showed a man who resembled Defendant and a man "bearing a strong resemblance to James Ardito, who is wearing a baseball cap and sunglasses that are similar to those worn by [the robbery suspect]." (Id.). In addition, another associate of Defendant reported that Defendant arrived at his residence on the morning of the robbery and was accompanied by a man named "Jim" who "was wearing the same clothing and matched the physical description" of the robbery suspect. (Id.). The associate

reported that Defendant and "Jim" both arrived and left in a cream-colored Cadillac driven by Defendant. (Id.). As a whole, this information plainly connects Defendant to the robbery himself, as well as, to Ardito around the time the robbery occurred.

The affidavit also connects the Sprint Number to Defendant. As already noted, the Sprint Number is saved to a contact listed as "John" in the phone associated with the Verizon Number. (Id. at 8–9). The affidavit also expressly states that the Sprint Number is "associated with [Defendant]." (Id. at 9). And an associate of Defendant reported receiving a video from Defendant which was sent from the Sprint Number. (Id. at 8).

Therefore, upon review of Investigator LaVoy's affidavit, this Court finds that Judge Halverson had a sufficient basis upon which to believe that probable cause existed for the issuance of the July 29, 2020, Sprint Number Search Warrant. The affidavit contains information indicating that the robbery suspect resembled Ardito, communications occurred between the Sprint Number and Ardito's number before and immediately after the robbery, the Sprint Number is associated with Defendant and has been used by Defendant, Defendant's white Cadillac was recognized as the vehicle involved in the robbery, and on the same morning as the robbery, Defendant was seen driving his Cadillac while accompanied by a man resembling and wearing the same clothing as the robbery suspect who was identified "Jim" which is an abbreviated form of Ardito's first name, James. When taken together, these facts set forth in the affidavit plainly establish a nexus between the evidence to be searched for and the Sprint Number.

Accordingly, the affidavit articulates a sufficient basis upon which to find that a fair probability existed to conclude that the search would uncover evidence of a crime, as well as, a sufficient basis upon which to demonstrate a nexus between the evidence to be searched for and

the Sprint Number; thus, there was probable cause for Judge Halverson to issue the warrant as it relates to the records related to the Sprint Number.

In addition, assuming solely for the sake of argument that the affidavit of Investigator LaVoy was not sufficient to establish probable cause or a nexus between the items to be searched for and the place to be searched, the Court concludes that officers relied in good faith on the probable cause determination by Judge Halverson when executing the July 29, 2020, Sprint Number Search Warrant. See, gen., Leon, 468 U.S. at 922. The affidavit in support of the July 29, 2020, Sprint Number Search Warrant, the contents of which have been discussed above, was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," nor did it render the warrant "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid." See, gen., Notman, 831 F.3d at 1089.

Therefore, to the extent it seeks an Order of this Court suppressing all evidence flowing from the execution of the July 29, 2020, Sprint Number Search Warrant, the undersigned recommends that Defendant's Motion to Suppress any Evidence Obtained as a Result of any Illegal Searches or Seizures, [Docket No. 25], be **DENIED**.

### iv.  The August 26, 2020, Motorola Phone Search Warrant

Defendant seeks an Order of this Court suppressing evidence flowing from the August 26, 2020, Motorola Phone Search Warrant. (Def.'s Mem. [Docket No. 41], at 3). Defendant argues that the August 26, 2020, Motorola Phone Search Warrant "suffers from all the infirmities of [the July 29, 2020, Sprint Number Search Warrant] and all evidence seized pursuant to it should be suppressed for the same reasons." (Id.).

As discussed above, "a magistrate reviewing a warrant application is charged with the duty of determining whether a 'fair probability that contraband or evidence of a crime will be found in

a particular place.'" <u>Alexander</u>, 574 F.3d at 489 (quoting <u>Hart</u>, 544 F.3d at 914). "[T]here must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue . . . ." <u>Tellez</u>, 217 F.3d at 550 (citing <u>Koelling</u>, 992 F.2d at 823).

Considering the affidavit submitted in support of the August 26, 2020, Motorola Phone Search Warrant which authorized law enforcement to the search the Motorola Phone, Judge Halverson could reasonably have concluded that there was a fair probability that evidence of the alleged robbery of Deerwood Bank would be found in the Motorola Phone.

As with the affidavit filed in reference to the July 26, 2020, Sprint Number Search Warrant, the affidavit clearly connects Ardito to the robbery. For example, the affidavit states that bank surveillance footage indicated that the robbery suspect was of similar height and weight as Ardito was listed in DVS records, and that both Ardito and the suspect had a gray and white goatee. (Gov't's Ex. 3 at 2–3). Furthermore, Ardito was reported by an individual that saw Ardito on the morning of the robbery as "wearing the same clothing" and "match[ing] the physical description" of the robbery suspect. (<u>Id.</u> at 4). In addition, a federal probation officer stated that Ardito bore "a strong resemblance" to the robbery suspect, and an associate of Ardito's stated that he believed the robbery suspect was Ardito. (<u>Id.</u> at 2–3). The affidavit also indicated that Ardito had been arrested in connection with the robbery. (<u>Id.</u> at 3).

The affidavit further connects Defendant and his Cadillac to both Ardito and the robbery. For example, an associate of Defendant reported that they recognized the vehicle that the robbery suspect fled in as Defendant's Cadillac. (<u>Id.</u> at 4). That same associate stated that Defendant had a friend named "James" who had previously done time for robbery, as well as, that Defendant stayed with James recently in a hotel. (<u>Id.</u>). Investigator LaVoy indicated that the surveillance footage from the Hotel where Defendant stayed on the day of the robbery showed a man who resembled

Defendant and a man "bearing a strong resemblance to James Ardito, who is wearing a baseball cap and sunglasses that are similar to those worn by [the robbery suspect]." (Id.). In addition, another associate of Defendant reported that Defendant arrived at his residence on the morning of the robbery and was accompanied by a man named "Jim" who "was wearing the same clothing and matched the physical description" of the robbery suspect. (Id.). The associate reported that Defendant and "Jim" both arrived and left in a cream-colored Cadillac driven by Defendant. (Id.). As a whole, this information plainly connects Defendant to the robbery himself, as well as, to Ardito around the time the robbery occurred.

In addition, the affidavit indicates that an arrest warrant was issued for Defendant, and Defendant was arrested. (Id. at 5). Upon his arrest, the Motorola Phone was taken from Defendant's person. (Id.). And Inspector LaVoy indicates that based on his training and experience, cellular phones are often utilized in furtherance of criminal activity, including aggravated robbery, and often contain evidence of such crimes. (Id.).

Therefore, upon review of Investigator LaVoy's affidavit, this Court finds that Judge Halverson had a sufficient basis upon which to believe that probable cause existed for the issuance of the August 26, 2020, Motorola Phone Search Warrant. The affidavit contains information indicating that Ardito resembled the robbery suspect, Defendant's white Cadillac was recognized as the vehicle involved in the robbery, and that there was a fair probability Defendant was with Ardito and driving his Cadillac around the time of the robbery. When taken together and coupled with the fact that the Motorola Phone was found on Defendant's person upon his arrest, these facts set forth in the affidavit plainly establish a fair probability that evidence of the bank robbery would be found on the Motorola Phone, as well as, a nexus between the evidence to be searched for and the Motorola Phone. Cf., United States v. Eggerson, No. 19-3742, 2021 WL 2303072, at *4 (8th

Cir. June 7, 2021) ("[I]t was 'reasonable to infer that cell phones found at a location associated with drug trafficking and on the person of an individual associated with [drug trafficking] had a fair probability of containing evidence of the crime.'").

Accordingly, the affidavit articulates a sufficient basis upon which to find that a fair probability existed to conclude that the search would uncover evidence of a crime, as well as, a sufficient basis upon which to demonstrate a nexus between the evidence to be searched for and the Motorola Phone; thus, there was probable cause for Judge Halverson to issue the warrant as it relates to the Motorola Phone.

In addition, the Court here too concludes that officers relied in good faith on the probable cause determination by Judge Halverson when executing the August 26, 2020, Motorola Phone Search Warrant. See, gen., Leon, 468 U.S. at 922.

The record currently before the Court shows that law enforcement's good-faith reliance on the warrant issued authorizing the search of the Motorola Phone militates against suppressing the evidence obtained during the execution of the August 26, 2020, Motorola Phone Search Warrant. The affidavit in support of the August 26, 2020, Motorola Phone Search Warrant was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," nor did it render the warrant "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid." See, gen., Notman, 831 F.3d at 1089.

Thus, the Court concludes that the officers involved relied in good faith on the August 26, 2020, Motorola Phone Search Warrant which had been issued by Judge Halverson.

Therefore, to the extent it seeks an Order of this Court suppressing all evidence flowing from the execution of the August 26, 2020, Motorola Phone Search Warrant, the undersigned

recommends that Defendant's Motion to Suppress any Evidence Obtained as a Result of any Illegal Searches or Seizures, [Docket No. 25], be **DENIED**.

## III.    DEFENDANT'S MOTION TO SUPPRESS ANY EVIDENCE OBTAINED AS A RESULT OF ANY ILLEGAL INTERROGATIONS [Docket No. 26]

Defendant moves the Court for an Order suppressing any statements obtained during the August 18, 2020, interview of Defendant. (Tr. [Docket No. 38], at 11–12).

At the Motions Hearing, the Government represented on the record that it would not use any statements made by Defendant during the August 18, 2020, interview in its case-in-chief. (Id. at 11–12). However, the Government reserved its right to use any such statements for impeachment purposes if Defendant testifies in his defense. (Id. at 12). Defendant persisted in his motion to suppress arguing that Defendant's statements were not voluntary, and therefore, they could not be used for impeachment purposes. (See, Id. at 12, 38–39). At the Motions Hearing, Defendant requested that his present motion to suppress statements be submitted on the record without additional briefing. (Id. at 38).

"Under established Supreme Court precedent," it is "permissible" for the Government to use "illegally obtained statements" for "impeachment and rebuttal purposes" after the person who made those illegally obtained statements first testifies at trial. Krimmel v. Hopkins, 44 F.3d 704, 709 (8th Cir. 1995) (citing Harris v. New York, 401 U.S. 222, 225 (1971)) (no Fifth Amendment violation to use illegally obtained statements for impeachment purposes); Michigan v. Harvey, 494 U.S. 344, 350–53 (1990) (same under Sixth Amendment). However, if a statement was not voluntary, then it may not be admitted for any purpose, including impeachment, because "*any* criminal trial use against a Defendant of his *involuntary* statement is a denial of due process of law." Mincey v. Arizona, 437 U.S. 385, 397–98 (1978) (emphasis in original).

27

As already noted, the Government has represented on the record that it will not use any statements made by Defendant during the August 18, 2020, interview in its chase-in-chief. (Tr. [Docket No. 38], at 11–12). Accordingly, the only issue now before the Court is whether Defendant's statements during the August 18, 2020, interview were voluntary, such that they may potentially be admissible for impeachment purposes. (See, Id. at 37–40).

In determining whether a confession was made voluntarily, a court "looks at the totality of the circumstances and must determine whether the individual's will was overborne." United States v. Syslo, 303 F.3d 860, 866 (8th Cir. 2002); see also, United States v. Annis, 446 F.3d 852, 855 (8th Cir. 2006) ("A statement is not voluntary if the totality of the circumstances shows the defendant's will was overborne."). In considering the totality of the circumstances, a court reviews whether the statement was "extracted by threats, violence, or direct or implied promises, such that the defendant's will was overborne and his capacity for self-determination critically impaired." United States v. Sanchez, 614 F.3d 876, 883 (8th Cir. 2010) (internal quotation marks and citations omitted); see also, Colorado v. Connelly, 479 U.S. 157, 167 (1986) ("[C]oercive police activity is a necessary predicate to . . . finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."). "More specifically, [a court] consider[s], among other things, the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." Id. (citing Sheets v. Butera, 389 F.3d 772, 779 (8th Cir. 2004)).

Defendant contends that his statements to law enforcement during the August 18, 2020, interview were not voluntary because "he said he didn't want to talk without a lawyer or that he didn't want to talk . . . [a]nd they kept questioning him and they never gave him a Miranda . . . warning . . . ." (Tr. [Docket No. 38], at 39). However, although the Interviewers did not give

Defendant a <u>Miranda</u> warning, that is just one factor to consider in the totality of the circumstances. <u>See</u>, <u>United States v. Taylor</u>, No. 04-219 JRT/FLN, 2004 WL 2066850, at *2 (D. Minn. Aug. 17, 2004) (noting that voluntary statements could be used for impeachment purposes despite the in-custody defendant having not been given a <u>Miranda</u> warning). Similarly, Defendant's purported requests for counsel do not preclude a finding that his statements were voluntary. <u>See</u>, <u>United States v. Zeigler</u>, No. 17-cr-30074-RAL, 2017 WL 6613404, at *5 (D.S.D. Nov. 29, 2017) (finding that further interrogation within twenty-four hours of the defendant's request for counsel violated <u>Miranda</u>, but the defendant's statements were still admissible for impeachment purposes because they were voluntary). Moreover, to the extent that any statements made by the Interviewers can be construed as misleading, "[t]actics such as deception . . . do not render a confession involuntary unless the overall impact of the interrogation <u>caused the defendant's will to be overborne</u>." <u>Simmons v. Bowersox</u>, 235 F.3d 1124, 1133 (8th Cir. 2001) (emphasis added).

After having reviewed the recording of the August 18, 2020, interview, as well as, the present record as a whole, this Court concludes that the totality of the circumstances shown in the present record do not indicate that Defendant's will was in any way overborne. Nothing in the present record indicates that the environment in which the interview occurred was inherently coercive, nor that the Interviewers engaged in any threatening or coercive tactics. The interview was conducted in the Crow Wing County Jail, in a room separate from Defendant's cell, and it was conducted at a reasonable, non-coercive time in the afternoon. (Tr. [Docket No. 38], at 17–18). Only two law enforcement officers were present during the interview, SA Eckardt and Sergeant Downie, and neither was armed during the interview. (<u>Id.</u> at 18, 22). Defendant was not handcuffed or otherwise restrained during the interview, and he was able to freely move his arms. (<u>Id.</u> at 21–22). Nothing in the present record indicates that the Interviewers physically restrained

or threatened Defendant during the interview. Further, the interview only lasted for approximately 23 minutes, thus it was not coercive in its duration. See, e.g., United States v. Makes Room, 49 F.3d 410, 415 (8th Cir. 1995) (noting that interrogation lasting more than two hours was not coercive in duration); Sumpter v. Nix, 863 F.2d 563, 565 (8th Cir. 1988) (finding confession was voluntary despite a seven and one-half hour interrogation).

The recording of the August 18, 2020, interview demonstrates that at the outset of the interview, the Interviewers informed Defendant that it was his choice whether to speak with them, he was not required to speak to them about any particular topic or at all, and he was in charge of the conversation. (Gov't's Ex.1 at 2:00–2:25). The recording of the August 18, 2020, interview further demonstrates that the interview was conducted in a conversational tone, and the Interviewers made no threats or promises to Defendant to induce his statements. See, Makes Room, 49 F.3d at 415 (concluding no coercive tactics were used where, among other things, officers made no threats or promises to the defendant). SA Eckardt testified that Defendant did not appear to be under the influence of drugs or alcohol. (Tr. [Docket No. 38], at 21). And the recording of the August 18, 2020, interview shows that Defendant spoke willingly with the officers, understood what was being asked of him, and responded appropriately and coherently to the questions presented throughout. (See, Gov't's Ex. 1).

Moreover, Defendant's ability to consistently deny any involvement in the robbery of Deerwood Bank throughout the interview further indicates that his will was not overborne. (See, Gov't's Ex. 1). And the voluntary nature of the interview and Defendant's statements is emphasized by the fact that when Defendant demanded to be returned to his cell, the Interviewers did indeed return Defendant to his cell thereby ending the interview. (See, Id. at 19:20–22:50).

Accordingly, under the totality of the circumstances, the Court concludes that Defendant's statements during the August 18, 2020, interview were voluntary. Although those statements may not be used in the Government's case-in-chief pursuant to the Government's representations on the record, they may be admissible for impeachment purposes if Defendant testifies.[8]

Therefore, the undersigned recommends that Defendant's Motion to Suppress any Evidence Obtained as a Result of any Illegal Interrogations, [Docket No. 26], be **DENIED**.

## IV.    CONCLUSION

Based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.  Defendant's Motion to Suppress any Evidence Obtained as a Result of any Illegal Searches or Seizures, [Docket No. 25], be **DENIED**, as discussed above; and

2.  Defendant's Motion to Suppress any Evidence Obtained as a Result of any Illegal Interrogations, [Docket No. 26], be **DENIED**, as discussed above.

Dated: June 17, 2021                                    s/Leo I. Brisbois
                                                        Leo I. Brisbois
                                                        U.S. MAGISTRATE JUDGE

## N O T I C E

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]" A party may respond to those objections within 14 days

---

[8] This Court notes that the ultimate admissibility of any such statements for impeachment purposes is a question to be determined later by the Trial Judge if the need for such a determination arises, and this Court does not comment on whether such statements will ultimately be admissible at trial.

after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.